## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

JACK CLARY,

      Plaintiff,

v.                                          Civ. No. 20-768 JAP/LF

TOTAL FACILITY SOLUTIONS, INC.,
and KENNETH MAJEWSKI,

      Defendants.

### MEMORANDUM OPINION AND ORDER

Plaintiff Jack Clary has sued Defendant Total Facility Solutions, Inc. ("TFS") and Defendant Kenneth Majewski for (1) intentional interference with existing business relations, and (2) defamation after he was laid off by his former employer, IES Communications, LLC ("IES").[1] Defendants seek summary judgment on both counts of Plaintiff's First Amended Complaint.[2] Plaintiff filed a response in opposition to the Motion,[3] and Defendants filed a reply,[4] completing briefing on the Motion. Having considered the parties' arguments, the evidence, and the applicable law, the Court will GRANT the Motion and will dismiss Plaintiff's claims with prejudice.

### BACKGROUND

In February 2019, IES entered into an agreement with Exyte U.S., Inc. ("Exyte"), the parent company of Defendant TFS[5], under which IES was subcontracted to perform work on a project at the Intel Corporation facility in Rio Rancho, New Mexico. See FAC at ¶ 3; Mot., Ex. A at 1. In

---

[1] See FIRST AMENDED COMPLAINT FOR INTERFERENCE WITH EXISTING BUSINESS RELATIONS ("FAC"), Doc. 1-4.
[2] See DEFENDANTS TOTAL FACILITY SOLUTIONS, INC. AND KENNETH MAJEWSKI'S MOTION FOR SUMMARY JUDGMENT ("Motion"), Doc. 26.
[3] See PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S [sic] MOTION FOR SUMMARY JUDGMENT ("Response"), Doc. 29.
[4] See REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT, Doc. 34.
[5] See Mot. at 1 n.1; Resp., Ex. A at 2 (15:17–19).

July 2019, IES hired Plaintiff as an at-will safety manager and assigned him to the Intel project. *See* FAC ¶¶ 6–8; Mot., Ex. B at 16–17. Plaintiff's position "required him to be onsite at Intel's facilities on a regular basis and ensure all contractors and employees of Intel were following all safety regulations and protocols." FAC ¶ 8.

Defendant Majewski is an environmental health and safety process manager employed by Defendant TFS who was also assigned to the Intel project site. *See* Resp., Ex. A; Resp., Ex. B. Plaintiff and Defendant Majewski participated in weekly safety meetings and had occasional interactions on the job site. *See* Resp., Ex. A at 3 (19:12–23). Prior to February 2020, Defendant Majewski had no concerns about Plaintiff's work, and Plaintiff performed his work without incident. *See* Resp., Ex. A at 3 (19:4–20:2).

On February 5, 2020, Plaintiff received a report of a possible on-site safety violation involving a crew working on scaffolding without proper tethering of crew members and tools. *See* Mot., Ex. B at 19; Resp. Ex. C at 1. When Plaintiff investigated the report, he saw Glenn Green, a TFS employee, working on a scaffold without wearing a harness. *See* FAC ¶ 9; Resp., Ex. C. Plaintiff believed this to be a "major safety violation." FAC ¶ 9. Although he did not witness it himself, Plaintiff believed, based on the initial report he received, that Mr. Green had committed another safety violation by dropping an untethered tool from the scaffold, which fell close to crew members who were working below. *See id.* at ¶¶ 9–10; Mot., Ex. B at 19. Plaintiff approached Mr. Green and discussed safety rules with him in a nonconfrontational way. *See* FAC at ¶¶ 11–12.

The same day, Plaintiff sent an email regarding the incident to Jason Lopez, Defendant TFS's safety manager. *See* Mot., Ex. B at 18–19. Plaintiff's email, which contained the subject line "Your guys were the ones in question[,]" said:

Hey Jason,

Have a talk with Glenn Green about tying off in a harness and tethering his tools. Either it was him or the guy below him that dropped a tool. Since I don't know which one dropped it all the way down to the basement I cant [sic] pin it on either one of them. They need tethers for their tools or don't even go out there, not to mention wear a harness when in question or if one is to go above the railing (Like I was told he was doing) but wasn't at the time I got there. Your guys are blessed today! I did tell Glenn Green if I witnessed or even hear about another incident he is involved in it will not be good for him.

Later,
Jack

*Id.* at 19. Shortly after Plaintiff sent his email, Mr. Lopez responded:

Jack,
I will look into this and the appropriate supervisors have been notified. However, if we don't know it was him, maybe we should hold off with the threatening words. I will get to the bottom of it.

Regards,
Jason Lopez, CSHO

*Id.* at 18. Plaintiff responded, "I didn't threaten. I warned. I put it like this… Consider yourself lucky." *Id.*

Mr. Lopez forwarded the email exchange to Bradley Powell, Defendant Majewski's safety lead, who brought the matter to Defendant Majewski's attention. *See id.* at 18; Resp., Ex. A at 2 (13:19–20). After speaking with Mr. Powell, Defendant Majewski spoke with Mr. Lopez, who informed Defendant Majewski that Mr. Green denied "what happened." Resp., Ex. A at 2 (15:9–13). In fact, Mr. Green later admitted to dropping a tool, but Defendant Majewski was never informed of that. *See id.* at 4 (26:19–21, 28:9–12).

Defendant Majewski did not speak with Plaintiff or Mr. Green about the incident or their interactions, but after reviewing the email Plaintiff sent to Mr. Lopez, Defendant Majewski felt that Plaintiff had violated Exyte's "Zero Tolerance Policy" ("Policy") by creating a hostile environment. *See id.* at 2 (13:24–14:5, 14:16–21); Resp., Ex. B at 3. Specifically, Defendant

Majewski felt that Plaintiff's statement to the effect that "'[i]f I hear of anything that happens again, it wouldn't be good for you'" was "hostile" and threatening. Resp., Ex. A at 2 (14:6–15); *see* Mot., Ex. B at 5 (57:1–3).

The same afternoon as the incident, Defendant Majewski met with Mr. Lopez, Plaintiff, and Cesar Pozos, IES's project manager for the Intel project. *See* Mot., Ex. B at 3–4 (55:14–56:15); Resp., Ex. B at 3. Defendant Majewski told Plaintiff that Plaintiff "was threatening," at which point Plaintiff "knew that [Defendant Majewski] was just bent on getting me by saying that I was threatening." Mot., Ex. B at 5 (57:1–3). Plaintiff, believing his email had been misinterpreted and misunderstood, apologized to both Defendant Majewski and Mr. Lopez for how he wrote his email and for things "getting all blown out of proportion." *Id.* at 4–5 (56:12–58:10). According to Plaintiff, Defendant Majewski responded, "'don't worry about it, it's okay.'" *Id.* at 5 (57:11–12).

Plaintiff heard shortly thereafter from Ryan Snell, IES's Director of Safety, that Exyte was considering "some kind of a disciplinary action" against Plaintiff, possibly a three-day suspension. *See id.* at 6 (58:11–24); Resp., Ex. B at 2–3. Indeed, Defendant Majewski took his concern regarding Plaintiff's conduct to his Intel Director, Jim Gawlista, and recommended that Plaintiff be removed from the project. *See* Resp., Ex. A at 2 (15:24–25, 16:12–18). Defendant Majewski had previously "banned" fourteen other people from the project. *Id.* at 3 (20:20–24). Although Mr. Gawlista did not review Plaintiff's email himself, he supported Defendant Majewski's recommendation based on Defendant Majewski's description of what had occurred. *See id.* at 2–3 (16:25–17:9, 18:6–8); Resp., Ex. B at 3.

On February 11, 2020, Defendant Majewski informed Mr. Snell that Plaintiff was being "dismissed" from the project for 90 days, effective February 12, 2020, for "willfully committing or demonstrating Hostile Behavior or Bull[y]ing." Resp., Ex. B. at 3. IES, which had already

undertaken an internal investigation, did not object to or challenge the decision to remove Plaintiff from the project, although Mr. Snell inquired whether Plaintiff would be allowed to return to the project after 90 days. *See id.* at 2–3. Defendant Majewski responded that Exyte would be meeting with Mr. Pozos the following day to "go over what we expect from IES moving forward" and that Mr. Pozos would inform Mr. Snell what the process would be for getting Plaintiff's "replacement" onsite. *Id.*

After Plaintiff was removed from the Intel project, IES informed him that it had no other work in New Mexico but offered him continued work if he was willing to travel. *See* Mot., Ex. B at 11 (70:17–25). When Plaintiff indicated that he was unable to travel, IES paid Plaintiff a severance and terminated his employment. *See id.* at 12 (71:4–18). IES invited Plaintiff to "keep [his] eyes open for any opening . . . at the Albuquerque site[,]" but no positions became available. *Id.* at 12 (71:12–14).

In May 2020, Plaintiff filed this lawsuit, alleging that Defendants (1) tortiously interfered with his existing business relationship with IES, causing Plaintiff to lose the benefit of his contract with IES, and (2) defamed him. *See* COMPLAINT FOR INTERFERENCE WITH EXISTING BUSINESS RELATIONS, Doc. 1-1. In July 2020, Plaintiff filed and served his FAC, which Defendants timely removed to this Court based on diversity jurisdiction. *See* NOTICE OF REMOVAL, Doc. 1. Defendants now move for summary judgment on both counts of Plaintiff's FAC.

## STANDARD

The Court will "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is no genuine dispute as to any material fact unless the evidence is such that a

reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute "is genuine if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way[,]" and is material "if under the substantive law it is essential to the proper disposition of the claim." *Becker v. Bateman*, 708 F.3d 1019, 1022 (10th Cir. 2013) (quotation marks and citation omitted).

In reviewing a motion for summary judgment, the Court considers the evidence and all reasonable inferences therefrom in the light most favorable to the non-moving party. *S.E.C. v. Thompson*, 732 F.3d 1151, 1156–57 (10th Cir. 2013). Initially, the party seeking summary judgment has the burden of showing that there is no genuine dispute as to any material fact. *See Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993). Once the moving party meets its burden, the non-moving party must show that genuine issues remain for trial. *Id.* Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23.

### DISCUSSION

Because the Court is sitting in diversity jurisdiction, the substantive law governing this case is that of New Mexico. *Racher v. Westlake Nursing Home Ltd. P'ship*, 871 F.3d 1152, 1164 (10th Cir. 2017); *Jones v. UPS*, 674 F.3d 1187, 1203 (10th Cir. 2012) (federal court sitting in diversity jurisdiction "applies federal procedural law and state substantive law"). The Court considers, in turn, whether Defendants have met their burden of demonstrating their entitlement to

judgment as a matter of law as to each common law tort claim brought, under New Mexico law, by Plaintiff.

## I.      "Intentional Interference with Existing Business Relations"

New Mexico recognizes the separate torts of (1) intentional interference with an existing contract, and (2) intentional interference with prospective contractual relations. *See Guest v. Berardinelli*, 195 P.3d 353, 363 (N.M. Ct. App. 2008). "When an employment relationship is at-will, any claim of intentional interference with that relationship is treated as interference with a prospective employment relationship."[6] *Zarr v. Washington Tru Solutions, LLC*, 208 P.3d 919, 923 (N.M. Ct. App. 2009). Although there is "considerable evidentiary overlap between the two causes of action[,]" *Guest*, 195 P.3d at 363, "New Mexico's cases have consistently recognized that existing contractual relations merit more protection than prospective contracts and that, as a result, a different analysis is appropriate for the two situations." *Zarr*, 208 P.3d at 922; *see Fikes v. Furst*, 81 P.3d 545, 552 (N.M. 2003) ("American courts are not as willing to protect interests in prospective contractual relations as they are to protect interests in existing contracts." (quotation marks and citation omitted)).

To prove intentional interference with prospective contractual relations, Plaintiff must show that Defendants damaged him either by inducing or otherwise causing IES not to continue its relationship with Plaintiff, or by preventing Plaintiff from continuing his employment with IES. *See Guest*, 195 P.3d at 363; *M & M Rental Tools, Inc. v. Milchem, Inc.*, 612 P.2d 241, 245 (N.M. Ct. App. 1980). Inducement in the context of tortious interference requires more than taking some action that eventually leads to a contractual relationship ending. To prevail on a tortious

---

[6] Although Plaintiff styled Count I of his FAC as a claim for "Intentional Interference with Existing Business Relations," *see* FAC at 3, he does not dispute that his claim must be treated as one for intentional interference with a prospective employment relationship based on the undisputed fact that he was an at-will employee of IES.

interference claim, Plaintiff must show that Defendants "played an active and substantial part in causing the plaintiff to lose the benefits of his contract." *Wolf v. Perry*, 339 P.2d 679, 682 (N.M. 1959). Specifically, Plaintiff "must allege (and prove) that the contract would otherwise have been performed, and that it was breached and abandoned by reason of the defendant's wrongful act and that such act was the moving cause thereof." *Id.* (quotation marks and citation omitted). "Unless the act complained of was the proximate cause of the injury there is no liability." *Id.* (quotation marks and citation omitted).

In addition to establishing causation, Plaintiff must prove that Defendants acted either with an improper motive solely to harm Plaintiff's relationship with IES or through improper means. *See Zarr*, 208 P.3d at 921 ("[T]he tort can be accomplished by either of two methods: improper motive solely to harm the plaintiff or improper means. If proven, either basis standing alone will support liability."). New Mexico courts are clear that "[e]stablishing tortious interference with contract is not easy" and that "tort liability attaches only when the interference is without justification or privilege." *Ettenson v. Burke*, 17 P.3d 440, 446 (N.M. Ct. App. 2000) (quotation marks and citation omitted).

### A. Causation

Defendants argue that Plaintiff's tortious interference claim fails because Plaintiff has no evidence of causation. *See* Mot. at 10. Specifically, Defendants argue that Plaintiff cannot show that Defendant Majewski's actions are what induced IES to terminate its relationship with Plaintiff. To support its contention that there is an absence of evidence to support the element of causation, Defendants point to the facts that IES (1) did not terminate Plaintiff's employment after Defendant Majewski had Plaintiff removed from the Intel project, and (2) in fact offered Plaintiff continued employment with IES, which Plaintiff turned down because it would have required him to travel.

8

*See id.* In response, Plaintiff points to three facts that he contends create a genuine issue of fact regarding whether there is sufficient evidence of causation: (1) "Defendant Majewski contacted IES informing them that Plaintiff will be removed from the project"; (2) "IES decided based upon Defendant Majewski's email that Plaintiff must be removed and that Plaintiff would be replaced by another IES employee"; and (3) "Plaintiff was only offered positions in other states because there was no other work for him in New Mexico." Resp. at 8–9. For the following reasons, the Court concludes that Plaintiff has failed to rebut Defendants' showing that there exists no genuine issue of material fact regarding causation.

To establish causation, Plaintiff must prove that some act by Defendants is what induced or caused IES to end its relationship with Plaintiff. Construed in the light most favorable to Plaintiff, the FAC alleges two "acts" by Defendants that Plaintiff alleges induced or caused IES to terminate him: (1) Defendants made "false allegations" that Plaintiff was "rude and aggressive towards their Employee"; and/or (2) Defendants removed Plaintiff from the Intel project site. FAC ¶ 15. The Court considers, in turn, whether the evidence of record could support the conclusion that either of the acts alleged induced or caused IES to terminate Plaintiff's employment.

The record undisputedly establishes that IES did not terminate its relationship with Plaintiff as a result of either Defendants' allegations that Plaintiff was "rude and aggressive" to TFS's employees or Defendants' related conclusions that Plaintiff's behavior created a hostile environment and constituted bullying. By Plaintiff's own allegations, IES "acknowledged [that] Plaintiff had been falsely accused and had not committed any wrongdoing." FAC ¶ 17. According to Plaintiff, even after he declined to travel for work and formally severed his relationship with IES, IES invited him to "keep [his] eyes open for any opening . . . at the Albuquerque site[.]" Mot. Ex. B at 12 (71:10–14). In other words, there is an absence of evidence even tending to show that

Defendants' allegations that Plaintiff acted in a rude, threatening, or bullying way induced IES to end its relationship with Plaintiff. By all accounts, IES was perfectly willing to continue its relationship with Plaintiff even after Defendants accused Plaintiff of unprofessional behavior.

The same is true regarding the effect that Defendants' act of banning Plaintiff from the Intel project had on IES's willingness to continue employing Plaintiff. After Defendant Majewski communicated to IES that Plaintiff was being banned because he was found to have engaged in hostile or bullying behavior in violation of Exyte's Policy, IES did not immediately terminate Plaintiff. Rather, IES offered to reassign Plaintiff to another project, albeit at a location outside of New Mexico based on work availability. It was only after Plaintiff declined to travel for work that IES and Plaintiff ended their contractual relationship on mutually agreeable terms.

While true that Defendant Majewski's act of banning Plaintiff from the Intel project set in motion a chain of events that eventually resulted in IES and Plaintiff ending their relationship, that is insufficient to support Plaintiff's tortious interference claim. There is an absence of any evidence that even arguably indicates that Defendants "actively sought to procure" a termination of Plaintiff's employment with IES or that Defendants' act of banning Plaintiff from the Intel project was a "substantial factor" in IES's decision to end its relationship with Plaintiff, which are considerations New Mexico courts take into account in determining whether a party was induced to terminate a contract. *See Wolf*, 339 P.2d at 682. The undisputed facts establish that what "induced" IES to end its relationship with Plaintiff was that IES had no projects in New Mexico to which it could assign Plaintiff and Plaintiff declined to travel for work. Because Plaintiff has identified no facts creating a genuine issue regarding what induced IES to terminate its relationship with Plaintiff, the Court concludes that there is no triable issue regarding causation.

## B.  Improper Motive or Improper Means

Even assuming *arguendo* that Defendants' banning of Plaintiff from the Intel project could be said to have "caused" Plaintiff to lose the benefit of his at-will contract with IES, the Court alternatively agrees with Defendants that they are entitled to summary judgment on Plaintiff's tortious interference claim because there is no evidence that Defendants acted either with an improper motive or through improper means in removing Plaintiff from the Intel project.

### 1.  Improper Motive

"New Mexico courts have adopted a view that where a defendant is accused of interfering with a plaintiff's opportunity to enter into prospective contracts, a strong showing must be made that the defendant acted not for legitimate business reasons but from some motive such as personal vengeance or spite." *Zarr*, 208 P.3d at 924. To succeed based on an improper-motive theory, the plaintiff must prove that the defendant acted with the *sole* motive to harm the plaintiff. *See id.* at 920 (affirming "the district court's use of the sole-motive standard as applied to the improper-motive ground for intentional interference" in a case involving an at-will employment relationship). "If the accused can show a legitimate business reason for the action, even if there also may have been a motive to harm the plaintiff, no material issue of fact exists" regarding whether the defendant had the requisite intent to cause harm needed to support a tortious interference claim based on improper motive. *Id.* at 924–25.

Plaintiff contends that the evidence shows that Defendant Majewski "had a personal vengeance to remove Plaintiff from the project because Plaintiff reported Defendant Majewski's employee for a major safety violation when an untethered tool was dropped from a scaffolding." Resp. at 8. According to Plaintiff, the evidence that supports the conclusion that Defendant Majewski "had intent to harm Plaintiff" comprises: (1) Defendant Majewski was not present when the incident occurred and did not speak with Mr. Green, (2) Defendant Majewski refused to accept

Plaintiff's apology, and (3) Defendant Majewski failed to discipline Mr. Green. Resp. at 7–8.  Even accepting Plaintiff's view of the facts—i.e., that Defendant Majewski willfully ignored evidence that Mr. Green committed a safety violation and retaliated against Plaintiff for reporting a safety violation by one of Defendant Majewski's employees—the evidence identified by Plaintiff does not support the conclusion that Defendant Majewski was *solely* motivated by personal vengeance or spite and a desire to harm Plaintiff.

First, Defendant Majewski's testimony that he was never informed that Mr. Green admitted to dropping the tool is undisputed. That testimony not only explains why Defendant Majewski never disciplined Mr. Green but also makes the fact that he failed to discipline Mr. Green incapable of creating a genuine issue regarding whether he acted with a sole intent to harm Plaintiff. Second, the Court cannot say that a rational trier of fact could conclude that Defendant Majewski's failure to speak with Mr. Green is evidence that Defendant Majewski removed Plaintiff from the project based on a sole motive to harm Plaintiff. Defendant Majewski testified that the primary impetus for the action he took was Plaintiff's email, which documented the so-called warning that Plaintiff admitted he gave to Mr. Green and that Defendant Majewski found to be threatening and in violation of Exyte's Policy. There was simply no need for Defendant Majewski to speak with Mr. Green given that there was no dispute over what Plaintiff said to Mr. Green. And third, a rational trier of fact could not conclude, on this record, that Defendant Majewski's refusal to accept Plaintiff's apology and view of the situation—i.e., that Plaintiff had merely warned, and did not threaten, Mr. Green—and his decision to remove Plaintiff from the project despite Plaintiff's apology is evidence that Defendant Majewski acted for reasons of personal vengeance.

The undisputed facts establish that at the time Plaintiff emailed Mr. Lopez, Plaintiff had neither verified that the workers' failure to harness was, in fact, a safety violation—it was not[7]— nor confirmed the identity of the person who reportedly dropped a tool from the scaffold. Yet Plaintiff did not hesitate to suggest that Mr. Lopez's "guys" had all committed safety violations by not wearing harnesses and to accuse Mr. Green of committing the additional safety violation of failing to tether his tools, despite acknowledging that he could not "pin it" on Mr. Green. In an email to his supervisor, Devin Harlan, summarizing the reasons for the disciplinary action taken against Plaintiff, Defendant Majewski explained that Plaintiff made assumptions about the incident and whether violations occurred without first making inquiries and assessing the situation. He expressed a specific concern that Plaintiff's interaction with Mr. Green, as documented in Plaintiff's email to Mr. Lopez, created a hostile work environment and failed to comply with Exyte and Intel's promotion of an incident-free workplace culture "where the Care and Concern and Safety for all employees will be at the forefront." Resp., Ex. C. Although Plaintiff believed his statement to Mr. Green—which he characterized as a warning—and his email to Mr. Lopez in which he repeated the statement were misinterpreted, he never denied making the statement, which Defendant Majewski undisputedly perceived as threatening and unprofessional. Indeed, when Defendant Majewski confronted Plaintiff and explained that he thought Plaintiff was being "threatening," Plaintiff apologized to both Defendant Majewski and Mr. Lopez for "how [he] wrote [the email.]"

---

[7] Defendant Majewski explained in an email to his supervisor that "[t]he employees were not required to be tied off" because the scaffold on which they were working had been green-tagged. Resp., Ex. C. Defendant Majewski also testified at his deposition that there were no harnessing-related violations because the scaffold had been "green-tagged," meaning that workers on the scaffold were not required to be harnessed. Resp., Ex. A at 4 (28:11–21). No evidence in the record refutes, or even calls into question, these assertions.

The foregoing not only explains why Defendant Majewski's refusal to accept Plaintiff's apology fails to create a triable issue regarding Defendant Majewski's motive but also is substantial evidence of a legitimate business reason for Defendants' removal of Plaintiff from the project: a concern that Plaintiff's handling of the safety incident—i.e., issuing warnings and making accusations without having all the facts, and using language that was perceived by numerous people to be confrontational and threatening—contributed to the creation of a hostile work environment. In light of this, and because Plaintiff fails to identify any other evidence even arguably supporting the conclusion that personal vengeance was Defendant Majewski's *sole* motive in acting to remove Plaintiff from the project, his tortious interference claim based on alleged improper motive fails.

### 2.   Improper Means

"What may qualify as 'improper means' depends to some degree on context and can include, but is not limited to predatory behavior, violence, threats or intimidation, deceit or misrepresentation, bribery, economic pressure, unfounded litigation, defamation, *unlawful conduct*, and perhaps violation of business ethics and customs." *Zarr*, 908 P.3d at 922 (emphasis added) (citing *M & M Rental Tools, Inc.*, 612 P.2d at 246).

Plaintiff argues that the improper means Defendants used to induce IES to terminate Plaintiff's contract was failing to provide IES with 48 hours' notice prior to removing Plaintiff from the project. *See* Resp. at 8. According to Plaintiff, under Section 3.3.1 of the Master Construction Services Agreement ("Master Agreement") between IES and Exyte, Defendants were required to provide IES with 48 hours' notice of any removal of IES personnel from the project, rendering Defendants' failure to do so a breach of contract and, thus, "unlawful conduct" that qualifies as evidence of Defendants' use of improper means. *See id.* Defendants argue that Section

3.3.1, in fact, gave them an "unqualified right" to remove IES personnel from the project and that Plaintiff's tortious interference claim necessarily fails as a result. *See* Mot. at 6–7. Although the Court disagrees with Defendants that their removal of Plaintiff in accordance with Section 3.3.1 per se precludes or immunizes them from Plaintiff's tortious interference claim,[8] the Court agrees that neither Defendants' failure to give IES 48 hours' written notice of Plaintiff's removal nor any other evidence in the record supports the conclusion that Defendants acted through improper means.

Section 3 of the Master Agreement is titled "Contractor's Rights." Mot., Ex. A at 4. Section 3.3 specifies Exyte's rights with respect to "Correction of Defective Work and Removal of Personnel." *Id.* Section 3.3.1 provides:

> Contractor may also serve Subcontractor 48 hours' written notice to remove Subcontractor's personnel (including Subcontractor's supervisor) from working on the Project site, or on the Project as a whole, as specified in the written notice. In instances of safety related incidents, the notice may be verbal (to be followed up in writing) and the specific Subcontractor personnel may be required to immediately leave the Project site. If Subcontractor fails to remove the specified personnel within 48 hours of receiving such notice, Contractor may, by written notice, require Subcontractor to stop the Work or any portion thereof or may terminate this Agreement.

---

[8] Defendants rely on *Beaudry v. Farmers Ins. Exch.*, 412 P.3d 1100 (N.M. 2018), as well as a number of non-New Mexico cases, to support their contention that "a tort claim is precluded where 'the gravamen of the allegedly tortious action was the defendant's exercise of a contractual right.'" Reply at 4 (quoting *Beaudry*, 412 P.3d at 1102); *see* Mot. at 6–7 and Reply at 3–5 (citing non-New Mexico cases). *Beaudry*—a case brought by an insurance agent against the insurance companies with which he had an agent appointment agreement, *see id.*, 412 P.3d at 1102—is inapposite. In *Beaudry*, the New Mexico Supreme Court held that a claim for *prima facie tort*, not tortious interference with contract, cannot lie where a defendant terminates a contract following a plaintiff's breach thereof, which is what happened in that case. *See id.*, 412 P.3d at 1102. Although the plaintiff in that case brought various contract claims, including a claim for tortious interference with prospective contractual relations, the plaintiff abandoned his tortious interference claim after the district court dismissed his breach of contract claim. *See id.* at 1103. The *Beaudry* Court concluded that the "gravamen of [the plaintiff's] cause of action was based on the allegedly wrongful termination of the Agreement" and that "[t]he closest analogy to [the p]laintiff's prima facie tort claim would be a claim for breach of the implied covenant of good faith and fair dealing." *Id.* at 1107. *Beaudry*, which involved a claim between contracting parties and neither considered nor addressed any question regarding a third party's tortious interference with contract claim, plainly does not stand for the proposition advanced by Defendants: that their contractual right to remove Plaintiff from the project defeats Plaintiff's tortious interference claim as a matter of law.

*Id.* Read in its totality, Section 3.3.1 clearly does not impose on Exyte an obligation to give IES 48 hours' written notice before it may remove one of IES's employees from the project. Rather, it reserves to Exyte the rights to (1) require IES to remove its personnel from the project no later than 48 hours after receiving written notice that Exyte is seeking removal, and (2) terminate the contract should IES fail to effectuate removal within 48 hours.

Here, Defendants first notified IES of a possible issue with Plaintiff on February 5, 2020, the day the incident occurred. *See* Mot., Ex. B. at 6 (58:11–24). That notification indeed prompted IES to undertake its own internal investigation into the matter. *See* Resp., Ex. B at 3. The record contains no evidence regarding what transpired the following week, either with Defendants internally or between Defendants and IES. However, it is clear from the February 11, 2020 email exchange between Defendant Majewski and Mr. Snell that IES had no objection to Plaintiff's removal and was ready to fully comply with Defendants' decision to remove Plaintiff from the project. *See* Resp., Ex. B. Indeed, despite that Defendant Majewski's email to Mr. Snell indicated that Plaintiff's removal was to take effect the following day, IES immediately removed Plaintiff from the project. *See id.* at 2. Plaintiff's contention that Defendants breached the contract by removing Plaintiff without providing 48 hours' written notice to Plaintiff or his employer fails as both a matter of fact and a matter of law.

Plaintiff has identified no other evidence that even arguably supports the conclusion that Defendants violated business ethics and customs or used predatory behavior, violence, threats or intimidation, deceit or misrepresentation, bribery, economic pressure, unfounded litigation, defamation, or unlawful conduct in removing Plaintiff from the project. The Court thus concludes that there is no genuine issue as to whether Defendants acted with improper means.

Because Plaintiff has failed to produce evidence of one or more of the essential elements of his tortious interference claim or designate specific facts showing that there is a genuine issue for trial, Defendants are entitled to summary judgment on Count I of the FAC.

## II.      "Defamation"

In New Mexico, the elements of the tort of defamation comprise: (1) the defendant published a specified communication, (2) the communication contained a statement of fact, (3) the communication was concerning the plaintiff, (4) the statement of fact was false[9], (5) the communication was defamatory, (6) the person receiving the communication understood it to be defamatory, (7) the defendant knew that the communication was false or negligently failed to recognize that it was false, or acted with malice, (8) the communication caused actual injury to the plaintiff's reputation, and (9) the defendant abused its privilege to publish the communication. N.M. U.J.I. ("UJI") 13-1002(B). A failure of proof as to any element defeats the claim. *See* UJI 13-1002(F) (instructing the jury that if it decides that any of the elements has not been established, it must return a verdict for the defendant and against the plaintiff); *see, e.g.*, *Fikes*, 81 P.3d at 549–51 (concluding that where the defendant made a prima facie showing that the recipients of the allegedly defamatory statements did not attribute a defamatory meaning to the statements and the

---

[9] The use note to N.M. U.J.I. 13-1002 explains that in accordance with United States Supreme Court precedent, the burden of proving falsity lies with the plaintiff "in most defamation actions." However, "in one category of defamation case, where a private plaintiff alleges defamation and the defamatory statement was not of public concern, the former general New Mexico rule that truth is a defense is probably still applicable." UJI 13-1002, Use Note; *see* UJI 13-1006, Use Note ("[I]n only one type of case can New Mexico's common law rule that truth is an affirmative defense possibly continue to apply. The supreme court has not barred the treatment of truth as an affirmative defense rather than falsity as part of the plaintiff's case where the plaintiff is a private figure and the subject matter of the alleged defamation is solely a matter of private concern."). Ordinarily, "[t]he trial judge should determine whether a matter is one of private or public concern, just as the judge must determine whether the plaintiff is a public official or public figure as a matter of law." UJI 13-1013, Directions for Use. However, the Court will not make determinations, here, regarding whether Plaintiff is a public official or figure and whether the matter is one of private or public concern because the parties have neither raised nor briefed these issues, and because the Court concludes that it is unnecessary to do so as explained herein.

plaintiff failed to rebut that showing, the district court properly granted summary judgment in the defendant's favor).

Initially, the Court agrees with Defendants that it is not clear what specific "communication" or "communications" Plaintiff alleges was or were defamatory. In his FAC, Plaintiff alleged only that "Defendants made false allegations against Plaintiff stating he was rude and aggressive towards their Employee" and that "[t]he statements were published to third parties, including Plaintiff's former employer." FAC ¶¶ 15, 26. Focusing on these allegations, Defendants argue that Plaintiff's defamation claim fails because there is an absence of evidence showing that the alleged communication (1) was published, (2) contained a statement of fact, (3) was false, or (4) caused actual injury to Plaintiff. *See* Mot. at 10–11. In his Response, however, Plaintiff argues that the defamatory "communication" was Defendant Majewski telling not only IES but also "his supervisor . . . and Intel that Plaintiff was creating a hostile and threatening environment." Resp. at 10. According to Plaintiff, "[t]his communication contains a statement of fact concerning Plaintiff because Defendant Majewski communicated to third parties that Plaintiff violated a zero-tolerance policy for hostile work environment and bullying." *Id.*

Although not articulated as such, Plaintiff in fact appears to be arguing that there are six separate communications that are actionable: (1) Defendant Majewski's statement to his Intel Director, Mr. Gawlista, that Plaintiff created a hostile and threatening environment; (2) Defendant Majewski's statement to Mr. Gawlista that Plaintiff violated Exyte's Policy; (3) Defendant Majewski's statement to his supervisor, Mr. Harlan, that Plaintiff created a hostile and threatening environment; (4) Defendant Majewski's statement to Mr. Harlan that Plaintiff violated Exyte's Policy; (5) Defendant Majewski's statement to IES that Plaintiff created a hostile and threatening environment; and (6) Defendant Majewski's statement to IES that Plaintiff violated Exyte's Policy.

Regardless of (1) whether the communication was that Plaintiff (a) "was creating a hostile and threatening environment" or (b) violated Exyte's Policy, and (2) who the alleged recipient of the communication was, the Court agrees with Defendants that none of the communications alluded to by Plaintiff is actionable.

Because the analyses differ based on the substance and audience of the communication, the Court first considers the communications that were published to Mr. Gawlista and Mr. Harlan, then separately considers the communications published to IES.

### A. Defendant Majewski's Communications to Mr. Gawlista and Mr. Harlan

The Court considers, in turn, the allegedly defamatory statements that Defendant Majewski made to Mr. Gawlista and Mr. Harlan. Although Defendant Majewski had separate communications with Mr. Gawlista and Mr. Harlan about the incident involving Plaintiff, the Court analyzes his statements to each together because the analysis is the same regardless of whether the listener was Mr. Gawlista or Mr. Harlan.

### 1. "Plaintiff was creating a hostile and threatening environment" is, on the record before the Court, a statement of opinion.

Defendants argue, categorically, that "[a] statement that someone's conduct is aggressive or threatening is a nonactionable statement of subjective opinion." Mot. at 11; *see* Reply at 7–8. Plaintiff counters that Defendant Majewski's statement cannot be considered a statement of opinion because it is not "speculatory" and because Defendant Majewski "did not begin his sentence with [']I think['] or [']I believe[']." Resp. at 11. Although the Court disagrees with Defendants' reasoning, the Court concludes that Defendants are correct that on the evidentiary record, Defendant Majewski's statement that "Plaintiff was creating a hostile and threatening environment" is nonactionable opinion.

"[C]ommon law defamation will lie for false statements of fact but not for those statements that are but fair opinion." *Moore v. Sun Publ'g Corp.*, 881 P.2d 735, 742 (N.M. Ct. App. 1994). "The crucial difference between statement of fact and opinion depends upon whether ordinary persons hearing or reading the matter complained of would be likely to understand it as an expression of the speaker's or writer's opinion, or as a statement of existing fact." *Marchiondo v. Brown*, 649 P.2d 462, 472 (N.M. 1982) (brackets, quotation marks, and citation omitted). "[I]f the material as a whole contains full disclosure of the facts upon which the [speaker's] opinion is based and which permits the [listener] to reach his own opinion, the court in most instances will be required to hold that it is a statement of opinion, and absolutely privileged." *Kutz v. Indep. Publ'g Co., Inc.*, 638 P.2d 1088, 1090 (N.M. Ct. App. 1981). "Conversely, where there are implications in the statement that the [speaker] has private, underlying knowledge to substantiate his comments about [the] plaintiff, and such knowledge implies the existence of defamatory facts, the statement is deemed to be factual and not privileged." *Marchiondo*, 649 P.2d at 472 (quotation marks and citation omitted). "[P]ublication of the predicate facts upon which the [speaker's] subjective surmise is based transforms what may otherwise be an allegation of defamatory fact into nothing more than the [speaker's] pure opinion with which the [listener] is free to agree or disagree." *Young v. Wilham*, 406 P.3d 988, 997 (N.M. Ct. App. 2017).

Here, the evidence establishes that Defendant Majewski disclosed to both Mr. Gawlista and Mr. Harlan the predicate facts supporting his statement that "Plaintiff was creating a hostile and threatening environment." Defendant Majewski testified at his deposition that although he did not show Mr. Gawlista Plaintiff's email to Mr. Lopez, he "explained it to Mr. Gawlista, told him exactly what happened" and that Mr. Gawlista evinced an understanding of the situation, responding to Defendant Majewski, "I will back you 100 percent because we will not allow that

20

kind of behavior on our project." Resp., Ex. A at 2–3 (16:12–17:9). Regarding Defendant

Majewski's email to Mr. Harlan, it conveys not only the facts related to the February 5, 2020

incident but also the statements Plaintiff made to Mr. Green as conveyed in Plaintiff's own email

to Mr. Lopez. *See* Resp. Ex. C. Specifically, Defendant Majewski's email to Mr. Harlan explained:

> Jack Clary had mentioned to the crew that you guys are blessed today, and if he
> Jack Clary even hears or witnesses an incident where Glenn Green (TFS) is
> involved it will not be good for him. (This is considered to be a threat and bully
> tactics.)

*Id.* Because Defendant Majewski fully disclosed the facts upon which he based his statement that

"Plaintiff was creating a hostile and threatening environment[,]" Mr. Gawlista and Mr. Harlan

were permitted to reach their own respective opinions regarding whether Plaintiff's "warning" to

Mr. Green created a hostile and threatening environment and constituted bullying. The statement

is, thus, one of pure opinion and, therefore, nonactionable as defamation.

### 2. Plaintiff has not established that Defendant Majewski knew, or negligently failed to recognize, that his statement alleging that Plaintiff violated Exyte's Policy was false.

"There cannot be no-fault defamation." UJI 13-1009 cmte. cmt. A non-public defamation

plaintiff must prove that the defendant either "knew that the communication was false or

negligently failed to recognize that it was false[.]" UJI 13-1002(B)(7)[10]. To prove the latter, the

plaintiff must show that the defendant "negligently failed to check on the truth or falsity of the

communication prior to publication." UJI 13-1009(B); *see Marchiondo*, 649 P.2d at 470 (adopting

"the ordinary negligence standard as a measure of proof necessary to establish liability for

compensation for actual injury" to reputation when the plaintiff is a non-public official).

---

[10] The Court assumes without deciding that Plaintiff was not a public official or public figure, meaning that the "lesser standard of ordinary negligence"—rather than actual malice—applies as Plaintiff argues, Resp. at 9 (quotation marks and citation omitted), and which Defendants do not challenge, *see* Reply at 7–10.

As an initial matter, it does not appear that Defendant Majewski's statement that Plaintiff's conduct violated Exyte's Policy is, in fact, provably false.[11] The policy in question provided:

3.1 Zero Tolerance Policy

Persons willfully committing the following acts, and persons instructing others to commit the following acts, will be removed and banned from the site (and possibly future sites).

Examples include *but are not limited to*:
a. Intentionally putting oneself or other [sic] at risk of injury;
b. Fall Protection: Working at height > 6' without 100% tie-off or edge protection;
c. Confined Space Entry: Failure to comply with confined space procedures;
d. COHE: Unauthorized removal or interference with a safety Lock Out or Tag Out device (Lockout/Tagout/or Blockout violation);
e. EEW: Unauthorized work on, or access to, energized electrical equipment (Life threatening electrical violations);
f. Trenching/Excavation: Excavation Procedure violations,
g. Cranes, rigging, hoisting violations,
h. Fire Prevention/Protection violations ('Spark Producing' Hot Work),
i. Special equipment violations

Resp., Ex. B at 3 (emphasis added). Although the policy enumerates specific examples of conduct for which a person can be removed, the list is non-exhaustive, indicating that other conduct may qualify as grounds for removal. If, for example, the list was exclusive, i.e., only the conduct enumerated qualified as a violation of the Policy, then Defendant Majewski's statement that Plaintiff's non-enumerated conduct constituted a violation of the Policy would be provably false. However, given the non-exclusive nature of the list, it is unclear how it could be proven that Defendant Majewski's statement that Plaintiff's creation of a hostile and threatening environment violated the Policy was false.

---

[11] The Court recognizes that Defendants argue in their Reply that this statement was true. *See* Reply at 8. Because the Court concludes that proof of another essential element is lacking, the Court need not reach the issue of the statement's truth or falsity, including whether proving the falsity of the statement is part of Plaintiff's prima facie case or whether Defendants bear the burden of establishing the statement's truth as an affirmative defense. *See supra* note 9.

Even assuming *arguendo* that Defendant Majewski incorrectly concluded that Plaintiff's conduct violated the Policy, thereby making his statement that Plaintiff violated the Policy false, Plaintiff has come forward with no evidence demonstrating that Defendant Majewski knew or negligently failed to recognize that the statement was false at the time he made it. The record undisputedly establishes that Defendant Majewski believed that Plaintiff's "threat" and use of "bully tactics" in communicating with Mr. Green—i.e., telling Mr. Green that if Plaintiff "even hear[s] about another incident [Mr. Green] is involved in[,] it will not be good for [Mr. Green]"— was conduct that violated the Policy. *See* Resp., Ex. A at 2 (14:1–15, 22–25); Resp., Ex. C. Plaintiff identifies no evidence even tending to suggest that Defendant Majewski told Mr. Gawlista or Mr. Harlan that Plaintiff violated the Policy either knowing the statement was false or negligently failing to recognize its falsity.[12] The communication is, therefore, not actionable.

## B.  Defendant Majewski's Communication to IES

Defendants argue that Plaintiff cannot establish that any communications they made to IES are actionable as defamation because, *inter alia*, the record establishes that Plaintiff was not actually harmed by any allegedly defamatory statements. Mot. at 11. To show that there is an absence of evidence of actual injury to Plaintiff's reputation, Defendants point to the facts that (1) IES continued to employ Plaintiff even after Defendants communicated their reasons for removing

---

[12] Plaintiff generally asserts that "Defendant Majewski knew that his communications to third parties were false because he was not present during the incident, never spoke to Plaintiff or Mr. Green about the incident, and even told Plaintiff to not worry about it." Resp. at 10–11. However, he offers no explanation of the relevance of the cited evidence vis-à-vis Defendant Majewski's communications to Mr. Gawlista and Mr. Harlan that Plaintiff violated the policy. Even assuming Plaintiff's assertion pertains to those specific communications, the cited evidence fails to raise a genuine issue regarding whether Defendant Majewski knowingly or negligently published a false statement. The facts that Defendant Majewski was not present for the incident and did not speak with Mr. Green about the incident are irrelevant given that the evidence undisputedly establishes that Defendant Majewski reached his conclusion that Plaintiff violated the policy based on Plaintiff's email, not the incident itself. And the fact that Defendant Majewski told Plaintiff, "don't worry about it, it's okay" when Plaintiff apologized for the situation "getting all blown out of proportion" can hardly be said to be evidence that Defendant Majewski knew or negligently failed to recognize the falsity of later telling Mr. Gawlista and Mr. Harlan that Plaintiff violated the zero-tolerance policy.

Plaintiff from the project, and (2) Plaintiff obtained subsequent employment.[13] *See id.* In response, Plaintiff asserts that Defendants' communication to IES "caused actual injury to Plaintiff because he was terminated from the project, his job, and was described as an individual who was hostile in the workplace." Resp. at 11. He additionally contends that "Defendant Majewski harmed Plaintiff's reputation by falsely stating that Plaintiff threatens and bullies' [sic] employees on the jobsite and creates a hostile work environment[.]" *Id.* at 12. What Plaintiff fails to do, however, is come forward with any evidence supporting these assertions and demonstrating that he suffered an actual injury to his reputation.

"At a fundamental level, defamation actions serve to compensate individuals for injury to reputation." *Young*, 406 P.3d at 1007. Injury to reputation is, indeed, "the very essence of the tort of defamation." *Smith v. Durden*, 276 P.3d 943 (N.M. 2012); *see* UJI 13-1001 ("Defamation is a wrongful [and unprivileged] injury to [a person's] reputation."). "[N]o matter how opprobrious a defendant's statement may be, a plaintiff is not entitled to recover damages unless he or she can show that it caused an injury to reputation." *Fikes*, 81 P.3d at 549. Proof of actual injury to reputation is thus an essential element of a defamation plaintiff's prima facie case. *See* UJI 13-1002(B)(8) (providing that the plaintiff has the burden of proving that "[t]he communication caused actual injury to the plaintiff's reputation"); *Smith*, 276 P.3d at 951 (explaining that "a plaintiff must first establish the prima facie case for defamation—which includes proof of actual injury to reputation—before a jury can award damages for mental anguish, humiliation, or any of the other recoverable harms listed in UJI 13-1010").

---

[13] In support of their argument regarding the absence of evidence of actual injury, Defendants assert in both their Motion and Reply that Plaintiff "obtained subsequent employment" but provide no citation to the record in support of this assertion. *See* Mot. at 11; Reply at 9. The Court has been unable to locate any evidence in the record indicating that Plaintiff obtained subsequent employment and, therefore, does not consider that purported fact in the ensuing analysis.

"Injury to reputation may manifest itself[,]" and can therefore be proven, "in any number of ways." *Smith*, 276 P.3d at 952. Evidence of lost employment or business, damage to one's good name and character among friends and neighbors, harm to one's good standing in the community, or even a decline in general social invitations may be sufficient to establish actual injury to reputation, "assuming such evidence could be proved and linked to the defamatory communication." *Id.*; *see* UJI 13-1010 (enumerating types of harm for which a successful defamation plaintiff may recover). A plaintiff's failure to come forward with any evidence demonstrating that his or her reputation was actually injured by the defamatory communication the defendant is alleged to have published is a proper ground for granting summary judgment. *See Smith*, 276 P.3d at 952 (concluding that "[t]he district court was correct in ruling that Plaintiff's failure to produce evidence of actual injury to reputation precludes his defamation claim as a matter of law" and holding that the New Mexico Court of Appeals erred in reversing the district court's grant of summary judgment in the defendants' favor).

Here, Plaintiff has failed to come forward with evidence to support his contention that any purportedly defamatory statements by Defendants to IES caused actual injury to his reputation. The closest he comes is referring to the fact that he lost his employment with IES, a fact that, on this record, is not evidence that Defendants' communications caused actual injury to Plaintiff's reputation. As previously discussed, the undisputed evidence establishes that IES did not terminate Plaintiff because of Defendant Majewski's allegedly defamatory communication. IES and Plaintiff ended their employment relationship on mutually agreeable terms after Plaintiff declined to accept an out-of-state assignment. By Plaintiff's own allegations, as well as the evidence of record, Defendant Majewski's allegations that Plaintiff had engaged in threatening, bullying behavior and created a hostile work environment did not negatively affect Plaintiff's reputation with IES in any

way. According to Plaintiff, IES concluded that Plaintiff had been "falsely accused" of bullying and "had not committed any wrongdoing." FAC ¶ 17. Even after Defendant Majewski made the allegedly defamatory statement, IES offered Plaintiff continued employment, which Plaintiff declined because it required him to travel, and invited Plaintiff to "keep [his] eyes open" for future employment opportunities with IES in Albuquerque. In light of this evidence, the fact that Plaintiff lost his employment with IES fails to create a triable issue regarding whether Defendants' communications to IES caused actual injury to his reputation.

Because Plaintiff has failed to adduce evidence to support an essential element of his defamation claim based on Defendants' allegedly defamatory communications to IES, the claim fails on that basis as well.

## CONCLUSION

The Court concludes that Defendants are entitled to summary judgment in their favor on both counts of Plaintiff's FAC.

IT IS ORDERED that DEFENDANTS TOTAL FACILITY SOLUTIONS, INC. AND KENNETH MAJEWSKI'S MOTION FOR SUMMARY JUDGMENT, Doc. 26, is GRANTED. Plaintiff's claims will be dismissed with prejudice by separate order.

_____

SENIOR UNITED STATES DISTRICT JUDGE